Keith WALKER, d/b/a Homefinder's,
Plaintiff, Appellant,

v.

PROVIDENCE JOURNAL COMPA-
NY et al., Defendants, Appellees.

No. 73–1308.

United States Court of Appeals,
First Circuit.

Argued Dec. 5, 1973.

Decided Feb. 27, 1974.

Rehearing Denied March 14, 1974.

Ralph J. Gonnella, Providence, R. I., with whom Hodosh, Spinella, Hodosh & Angelone, Providence, R. I., Max D. Stern, Stern & Shapiro, Boston, Mass., and Anthony F. Pennacchia, Providence, R. I., were on brief, for appellant.

Knight Edwards, Providence, R. I., with whom Edward F. Hindle, Jonathan E. Cole, Edwards & Angell, Michael DeFanti, Hinckley, Allen, Salisbury & Parsons, Providence, R. I., Richard J. Israel, Atty. Gen., and Dorothy A. Carr, Special Asst. Atty. Gen., were on briefs, for appellees.

Before COFFIN, Chief Judge, Mc-ENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Homefinders of America, Inc. (Homefinders), a corporation with a primary place of business in Denver, Colorado, is engaged in the business of licensing or franchising independent businessmen in various states and Canada to use the Homefinders trademark and its distinctive method of providing information about housing vacancies. Keith Walker, the plaintiff, was the franchisee for Rhode Island.

Walker brought suit in the district court on March 5, 1973, alleging that the Providence Journal Co. (Journal), publisher of the only statewide morning and evening newspapers (which held at least two-thirds of all newspaper readership in the state) had violated the antitrust laws, 15 U.S.C. §§ 1 and 2, by attempting to fix the price Walker could charge for his service,[1] by refusing to deal with him, and by attempting to monopolize the market in rental information services by eliminating competitors to the classified advertising section of the papers. Walker sought preliminary and permanent injunctive relief and treble damages. This appeal is from the court's denial, after hearing, of a preliminary injunction upon the ground that there was no proper plaintiff before the court. We affirm, but for different reasons.

Walker commenced business in Rhode Island during 1972. Following the Homefinders format he sold for $20 a

1. The paper allegedly attempted to fix a price of zero by conditioning advertising on Walker's agreement to accept no payment from prospective tenants.

"policy" entitling its holder to use for a period of one year the services of Homefinders operations throughout the United States. A policy holder was granted access to listings of vacancies classified according to the requirements of different clients; the listings were in catalogues permitting selection by location, price range, landlords' willingness to take children, pets, etc. The office would supply this listing information upon telephoned or personal inquiry.

Walker culled many but not all his listings from classified newspaper ads. In turn Walker advertised his service in newspapers, primarily those of the Journal. Walker and the Journal signed a one-year classified advertising contract, which provided for a number of such ads daily. These ads were alleged to be crucial to the business in two ways: they attracted customers to buy Homefinders' policies, and they attracted owners to list their vacancies with Homefinders.

After Walker began advertising in the papers several agencies [2] received complaints about Walker's service and forwarded them to the Journal. The Journal cancelled the advertising contract, but shortly thereafter reinstated it and the advertising continued until January 31, 1973. On February 1, 1973, the Journal wrote to Walker that it would take no more ads; it simultaneously cancelled the advertising contracts of two other firms in Rhode Island then providing rental listing services for which they charged prospective tenants.[3] The letter of cancellation recited that the new policy was for the benefit of both the Journal and its readers.[4] Attempts to negotiate a new format for the ads proved futile, although Walker allegedly offered to cast the ads in any nondeceptive form acceptable to the Journal and accurately describing the service rendered. Plaintiff claims that the Journal refused such offers.

The hearing on Walker's prayer for preliminary injunction was had on May 10 and 11, 1973. Although his counsel appeared, Walker himself did not attend. Counsel revealed that, approximately two weeks prior to the date of the hearing (although about three months after the Journal had stopped running Walker's ads and two months after the complaint had been filed), Walker had closed his doors and left the state. His franchise with Homefinders had thereupon, under its terms, been cancelled. Counsel stated that the litigation would go forward in the interest of a Mr. Glist, the president and principal stockholder of Homefinders, and of another stockholder. Later during the hearing, through statements of counsel and testimony of Glist himself, it was developed that Homefinders, after discovering Walker's default, had named Charles R. Campbell, the Boston licensee, to operate the Rhode Island franchise temporarily. Campbell, however, had soon withdrawn, having found the cost of servicing existing policies [5] to exceed any income that

2. These agencies, and their directors, have also been named as defendants. They include the Better Business Bureau, the Rhode Island Consumer's Council, and the Rhode Island State Department of Business Regulations. The Consumers' Council was dismissed by stipulation because it possessed sovereign immunity; a motion to dismiss filed by Edwin P. Palumbo, director of the Council, has been denied.

3. One of the other firms changed its form of operation and began to collect a fee from landlords rather than prospective tenants; its advertisements have been reinstated.

4. There was no specific indication that new complaints about Walker's service had led directly to the cancellation. Plaintiff claimed at oral argument that only five among Rhode Island's approximately 6,000 policyholders are known to Homefinders to have complained. It has been intimated that termination might be related to the criminal prosecution initiated against Walker alleging that he acted as a real estate broker without a license. A similar prosecution in Maryland was dismissed. Real Estate Commission v. Phares, 268 Md. 344, 302 A.2d 1 (1973).

5. Walker had not made any refunds to the policyholders before his sudden departure from Rhode Island and may have left other debts. These facts may explain both Campbell's and Homefinders' reluctance to become formally identified either with the Rhode Island franchise or this litigation.

could be attracted without newspaper advertising, and having also found that without advertising it was difficult to attract the landlord listings necessary to furnish service to policyholders. Glist testified to Homefinders' continuing desire to operate or license·a Rhode Island franchise whenever it became possible to advertise.

At the hearing plaintiff's counsel took the position that Walker was no longer a party. But he insisted that F.R.Civ.P. 25(c) provided for a "substitution" of parties, and that Walker's interest in an injunction had been "transferred" to Homefinders. When the hearing ended it was unclear whether Homefinders or Glist meant to intervene formally.

Twenty days after the hearing, but three months before the district court rendered its decision, plaintiff's counsel filed two affidavits. One was from Walker, then residing with his wife's family in Arizona, asserting his intention to continue as plaintiff and a desire to return to run the Rhode Island franchise, but only if financially able. The other was from Homefinders, stating that it had notified Walker that the Rhode Island franchise rights would be granted to him when and if "the franchise commences to operate again", and stating an intention to retain Walker's attorneys to litigate this case. Homefinders did not, however, move to be substituted or to join as a plaintiff (nor was joinder ordered by the court). In an amended complaint filed with leave in June, 1973, Walker carried on as the sole plaintiff.

The district court on September 6, 1973, dismissed the prayer for preliminary relief against the Journal after an opinion which ended with the somewhat enigmatic statement that there is "no proper plaintiff before the court in this action." Although that ground, standing alone, might suggest that the entire action should be dismissed, the ruling related solely to Walker's standing to seek a preliminary injunction. There is

no indication that the court meant to foreclose Walker's claim for damages or even, to the extent different facts might later be developed, his prayer for a permanent injunction. And because a more complete picture may yet be developed, our own present opinion, relating solely to the record as it now stands, should not be read to preclude the district court from reaching other conclusions concerning the interests and intentions of Walker (and Homefinders) should an expanded record warrant them.

But for present purposes, and on the existing record, we disagree with the district court's conclusion, as we understand it, that preliminary relief had to be denied for want of a showing that there was a proper·plaintiff. Although we think there are other reasons to deny preliminary relief, it should not have been denied on the ground stated.

■ An antitrust defendant does not necessarily avoid injunctive relief because it succeeds in driving a proper plaintiff out of business before the court has time to rule on a request for an injunction. Even though he is not currently conducting business in the market allegedly encumbered with the illegal conduct, an aggrieved party may retain a sufficient interest to seek and obtain injunctive relief against a violation of the antitrust laws. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), on remand 418 F.2d 21 (7th Cir. 1970), rev'd on other grounds 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). He "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Id.* at 130, 89 S.Ct. at 1580. In Bus Employees v. Missouri, 374 U.S. 74, 78 (1963), it was held that even though the acts complained of no longer had a direct injurious effect, plaintiff could still seek an injunction where the dispute remained unresolved[6] and there

6. Our case of Mendez v. Bowie, 118 F.2d 435 (1st Cir.), cert. denied sub nom. Rios v.

Bowie, 314 U.S. 639, 62 S.Ct. 76, 86 L.Ed. 513 (1941), is not to the contrary. Plaintiff

was "not merely the speculative possibility of . . . some future . . . dispute, but the presence of an existing unresolved dispute . . . ."

It is true that the genuineness of Walker's desire to return to the market from which the Journal's conduct allegedly drove him is questionable. As for Walker, the alleged injury may be complete rather than continuing, thus rendering a preliminary injunction inappropriate as to him. While Walker asserted by affidavit a qualified intention to return to Rhode Island, we cannot say the district court was found to believe him.

■ Homefinders, however, remains subject to current injury from the alleged antitrust violation. As a transferee of Walker's interest in the Rhode Island market, its position undergirds Walker's. *See* F.R.Civ.P. 25(c). When the original complaint was filed Walker was still transacting business; although during the pendency of the action the Walker franchise "terminated" and was not "assigned" to Homefinders, Homefinders, as franchisor, automatically reacquired the rights it had ceded to Walker. It came again to possess the right to place or operate a franchise in

Rhode Island. Homefinders, furthermore, was obligated, through its remaining franchisees, to service the policies. When the agreement was terminated, Walker was required to turn all his books and records over to Homefinders and Homefinders was entitled to use a $20,000 reserve fund, established by the agreement, to service Walker's policies, and to charge Walker for any additional sums expended in so doing.[7] Finally, once Homefinders succeeded to the right to conduct or relicense the Homefinders operation in Rhode Island, it also found itself saddled with the same burden borne by Walker—the inability to advertise the business in the Journal.[8]

■ Rule 25(c) provides that in case of any transfer of interest the action may be continued by the original party unless the court upon motion directs substitution or joinder. Homefinders should have moved for joinder, but its mere failure to do so was not fatal. *See* 3B Moore's Federal Practice ¶ 25.08. Homefinders has made known its interest in carrying forward the litigation. We would feel differently had the district court on reasonable terms ordered Homefinders to join, and had Homefinders declined.[9] The court could have

---

sought an injunction against and damages for trespass to land, but sold the land after commencement of the suit. We held that the action for damages, but not for an injunction, survived the sale. However, plaintiff in *Mendez* sold his entire interest in the land; Walker and Homefinders filed affidavits indicating at least a conditional desire by Walker to resume the Rhode Island franchise and Homefinders' willingness that he do so. Moreover, plaintiff's sale did not deprive the buyer of standing to seek an injunction; we pointed out that it was "apparent . . . that the purchaser of [the land] does not wish to become involved in this litigation . . . ." Homefinders, by way of contrast, does want to participate and actively supports the relief sought. Homefinders and, more marginally, Walker have a continuing interest in the injunctive claim, whereas only the buyer had such an interest in *Mendez*.

7. The fact that Homefinders has, instead of using these options, left the policyholders to shift for themselves without either service or refunds might militate against the grant

of equitable relief, but it would not undermine Homefinders' standing to seek it.

8. Homefinders' desire to enter the market is not so "speculative" that injunctive relief becomes inappropriate. Homefinders, through its franchisee, has already been a participant in the market and is therfore even more closely connected to it than was the plaintiff in *Zenith, supra.* Cases cited by the Journal such as Holiday Inns of America, Inc. v. B & B Corp., 409 F.2d 614 (3d Cir. 1969), are inapposite; they are trademark cases rather than antitrust, and involve plaintiffs with no past or current connection with the subject market. *See Id.* at 618 n. 13.

9. Under Rule 21 the court on its own initiative could have ordered the joinder of Homefinders. It should do so. Homefinders ought not to be permitted to occupy its present ambiguous role as a kind of nonlitigant litigant. 3A Moore's Federal Practice ¶¶ 21.04 [1] & [2]; Hackner v. Guaranty Trust Co., 117 F.2d 95 (2d Cir.), cert. denied 313 U.S. 559, 61 S.Ct. 835, 85 L.Ed. 1520 (1941).

forced Homefinders either to join or forfeit any further claim of interest in the litigation. But it did not do so and, under Rule 25(c), Homefinders must be counted in determining whether there is a "proper plaintiff before the court."

Walker and Homefinders together possess the totality of rights, duties and expectations concerning the operation of a Homefinders business in Rhode Island. These present interests, combined with the alleged past injuries, provided adequate standing to seek the issuance of injunctive relief should it otherwise have been appropriate.

■ While there was thus a showing of standing and interest sufficient to seek a preliminary injunction against the alleged antitrust violations, it does not follow that the district court erred in withholding relief, nor that we should direct that an injunction be entered. A plaintiff urging us to adopt such a course, notwithstanding the district court's failure to reach its legal claims, has to show that, on the record as developed in the district court, it is virtually certain to prevail. Automatic Radio Mfg. Co. v. Ford Motor Co., 390 F.2d 113 (1st Cir.), cert. denied 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968). It has not made such a showing.

■■ Plaintiffs urge that the Journal has violated both §§ 1 and 2 of the Sherman Act. The § 1 claim fails because the record in this case does not disclose the presence of a "combination or conspiracy"; it appears, instead, that the Journal has acted on its own. Since a corporation cannot conspire with its own employees, Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 82–84 (9th Cir. 1969), cert. denied 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970), plaintiff must search elsewhere for a plurality of actors pursuing a "joint [and] collaborative" policy. United States v. General Motors Corp., 384 U.S. 127, 145, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). The only other named defendants in this case have, so far as the record discloses, done no more than forward to the Journal complaints about Walker's service. They have not embarked with the Journal upon a joint course of conduct. Nor is Walker helped by his imaginative theory that the Journal collaborated with Walker because, when the Journal refused to accept Walker's ads, Walker ceased advertising. Although the conspiracy requirement of § 1 may have faded enough over the years to include even conspiracies with unwilling coconspirators, see Albrecht v. The Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed. 2d 998 (1968), and conspiracies with customers, United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed. 2d 505 (1960), the doctrine is not yet so chimerical that the *refusal* of one party to deal or agree further with another can be construed as an agreement.

■ This leaves only the § 2 theory that the Journal was attempting to monopolize the Rhode Island market in "informational services." This market presumably refers to the market for information about housing vacancies; we say presumably because plaintiffs have made no attempt to define the market, and have made no proof that the Journal has anything approaching a monopoly in it. Such careful definitions and proof are indispensable in antitrust actions. It may be that, utilizing the theory of United States v. Otter Tail Power Co., 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), plaintiffs will be able to demonstrate that the Journal has used an alleged monopoly in the newspaper or advertising markets to attempt to establish a monopoly in the market for vacancy information. *Cf.* Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951). But we cannot say that plaintiff demonstrated on the record before the district court such a likelihood of success on the merits as would have required the issuance of a preliminary injunction.

Order denying preliminary injunction affirmed.